## GAULDEN *v.* MCPHAUL.

In cases unattended with any of those circumstances which give rise to aggravated dama-
ges, the direct and immediate, or the natural and proximate, consequences of an act are
alone to be considered, in ascertaining the responsibility for the commission of an act un-
authorized by law.  C. C. 1928 s. 2, 2294, 2304.

Where a deed was executed in another State, by which certain slaves were conveyed in

GAULDEN
v.
McPHAUL.

trust to secure the payment of a note payable to the creditor or bearer, the slaves remaining in the possession of the debtor, the trustee cannot, in case of the removal of the slaves to this State, enforce the execution of the trust, nor take possession of the slaves, without proof of the debtor's being in default by the non-payment of the note. Without such proof the trustee would be responsible for any loss sustained by the debtor from a seizure of the slaves. *Per Curiam:* We must not be understood as recognizing the right of trustees to execute trusts created on slaves actually within this State, without the intervention of judicial proceedings.

APPEAL from the District Court of Point Coupée, *Farrar*, J.    *Ratliff* and *Cowgill*, for the plaintiff.    *Cooley*, for the appellant.    The judgment of court was pronounced by

EUSTIS, C. J.    This is an action on the part of plaintiff against the defendant, to recover the value of a slave named *Albert*, alleged to have come to his death in consequence of the illegal, violent, and unwarrantable conduct of the defendant, in attempting, in company with two other men, to seize and carry off the said slave, with several slaves belonging to plaintiff, while engaged at work at a wood-yard near Port Hudson, in the parish of East Feliciana.    The petition alleges that said *McPhaul*, with two other men, went to the wood-yard of the plaintiff, and attempted with force and violence to seize and carry away plaintiff's slaves, and so frightened them that *Albert* and several others ran off, and, in attempting to get home to the residence of petitioner, one of the said negroes died on the roadside, and the others, from the fright and fatigue, were greatly injured.

The defendant pleaded the general issue.    In an amended answer the defendant alleged that, he had a right to seize and take possession of said slaves by virtue of a deed of trust, given by said plaintiff to *Francis Cooley*, of the said slaves, for the use and benefit of defendant, to whom said plaintiff was indebted in a large sum of money, and, by virtue of a power of attorney from said *Cooley* to defendant, empowering him to carry into effect said deed of trust, which was executed in Wilkinson county, State of Mississippi, on the 6th of November, 1848; that said slaves were removed from the State of Mississippi to this State, in order to defraud respondent of his just rights thereon, under the impression that they could not be seized under a deed of trust, etc.

There have been two verdicts for the plaintiff, and from the judgment in the last one this appeal is taken by defendant.

It appears that *Gaulden*, the plaintiff, with his mother, had established a wood-yard near Port Hudson, in the parish of East Feliciana, where he had a number of slaves under the management of *James Freeman*, who resided with his family on the premises.    The residence of *Gaulden*, the plaintiff, was upwards of thirty miles distant, in the county of Wilkinson, State of Mississippi. On the 12th of March, 1845, the defendant. in company with *B. Buller* and *Wiley Dixon*, went to the house of *Freeman*, during his absence, for the purpose of taking several of the slaves of *Gaulden*, for which a deed of trust had been given by *Gaulden*, under which he was authorized to act, and attempted to take them.    The testimony relating to the acts which constitute this attempt is not very definite, inasmuch as we infer from the testimony that the slaves took to flight on hearing that the defendant and his men came to take them.    The slaves ran off, abandoned the place, and were next heard of at the residence of the plaintiff, with the exception of the slave *Albert*, who was found dead on the roadside in the direction of his master's residence on the day after the appearance of the defendant at the wood-yard.    It appears also

that three other slaves who had thus fled were injured from fatigue, so that they were unable to work for several days. The slave *Albert* was worth $800, was young, healthy, and accustomed to labor. If the facts authorized the verdict, the jury were justified in assessing the damages sustained by the plaintiff, in consequence of his loss, at $800.

We have not been able to discover that the defendant made use of any means of violence, or did any act calculated to produce alarm or terror, but his conduct and that of his attendants on the premises was that of a man attempting to exercise what he conceived to be a legal right.

In relation to the responsibility of the defendant for the loss of the slave *Albert*, it is obvious that the cause is remote from the effect. The mere fatigue of the journey on foot at that season of the year, to a slave of the age and constitution of *Albert*, is not a reasonable cause which can be assigned for his death. Nor does the alarm produced by the acts of the defendant, as contended by the counsel for the plaintiff, rest upon anything else but mere conjecture. It was within the power of the plaintiff to have established the cause of the death of his slave beyond any doubt, by a *post mortem* examination of his body. Those who testify to the death of the slave show that his body was examined externally, but no medical man has given any opinion as to the cause of the death; that of the other witnesses is entirely conjectural and unsatisfactory.

This case we consider unattended with any of those circumstances which give rise to aggravated damages; and, in this class of cases, it is a settled rule of our jurisprudence to adhere to the principle, that the direct and immediate, or the natural and proximate, consequences of the act are alone to be taken into consideration. See the cases of *Delery* v. *Mornet*, 11th Martin, p. 10. Civil Code, 1928 § 2, 2294, 2304. 6 Toullier, § 289. In proportion as the consequence of an act is remote the uncertainty of its being the cause is increased infinitely, of which the present case is a strong illustration. The alarm produced at the wood-yard among the slaves of *Gaulden*, may well have induced them to flee from those who attempted to take them; but the cause is entirely an inadequate one for their leaving their established working place, and going a distance of thirty miles to their master's residence. We cannot leave out of view that the cause of this journey may have been in the sense the slaves had of acting in the interest of their master, probably at his prompting, to save his property from the grasp of a determined and vigilant creditor. There is no evidence showing that the slave *Albert* ever saw the defendant, or those who accompanied him at the wood-yard; and we consider the evidence as not establishing that his death was caused by their acts.

The view that we have taken of the cause of the death of the slave *Albert*, and the exemption of the defendant from all responsibility in consequence thereof, applies to the right of the plaintiff to claim damages produced by the fatigue of the other slaves in their journey to their master's residence. But the plaintiff also claims damages for the interruption and disturbance of the labor of the slaves by the acts of the defendant, as heretofore stated. The defendant, as we have seen, alleges that he had a right to seize and take into his possession the slaves of the plaintiff which were at the wood-yard, under a certain deed of trust. The instrument offered in evidence in support of this allegation is a deed, bearing date the 6th day of November, 1843; it purports to have been made by the plaintiff on one part and *Francis Cooley* on the other part, both of the county of Wilkinson, State of Mississippi, where the deed was executed and recorded. The deed conveyed to *Francis Cooley* four certain slaves then being in the

11

GAULDEN
v.
McPHAUL.

county and State aforesaid, for the benefit of the defendant in this suit, who was the endorser of the plaintiff's note for the sum of $810, which was made at the time of executing the deed, and was payable to the defendant, *or bearer*, and was due on the 1st of March, 1845. To secure the payment of this note the deed of trust was executed, and it provided that "in case the said *M. G. Gaulden* shall not pay and discharge the said note when it becomes due, then and in that case the said *Francis Cooley* is hereby authorized, upon giving three weeks public notice by advertizement in any one of the newspapers in the town of Woodville, to expose to sale, and sell and convey to the highest bidder, for ready money, the whole, or so many of the aforesaid negro slaves, as will satisfy and pay all the amount due on said note." The defendant held a power of attorney from the trustee, in which he was fully "empowered to take the said negro slaves wherever they may be found, for the purpose of carrying into effect and due execution the trusts mentioned in the deed aforesaid." It appears that the defendant, in his attempt to take these slaves, acted under the advice of counsel, who gave it as his opinion that the right to seize the slaves in Louisiana was identical with the right to take them in the State from which they were removed, and in which the deed of trust was executed.

The slaves were, at the time of the act complained of, in the peacable possession of the plaintiff. There is no evidence concerning the note, the payment of which the deed of trust was made to secure, and which was payable to the defendant, or *bearer*; nor of its payment by either the defendant, who was the endorser, or the plaintiff, who was the maker; nor of any protest of the note, nor of any amicable demand made on the plaintiff for the amount. We have often experienced great difficulty in giving effect under our laws to instruments of this kind made in other States. According to our law, the defendant, in the execution of this trust, could have no right to take possession of the slaves, except in the contingency provided for in the deed. The plaintiff never having parted with the possession of the slaves, the trustee has no right to take them unless *Gaulden* placed himself in default by the non-payment of the note when it became due, and he cannot be held to be in that position until after an amicable demand made upon him. No court in Louisiana would permit the defendant to take the slaves under this instrument until after the default should have been established. It follows therefore that, whatever the right of the defendant may have been, he has not made out by evidence a justification of his attempt to take the slaves of the plaintiff, as complained of, on the 12th of March, 1845. Confining therefore our estimate of the injury done to the plaintiff to the interruption and disturbance of the labor of his slaves at the wood-yard, we do not feel ourselves authorized to assess the damages at a higher sum than $100. In correcting the error into which the juries have fallen, we applaud the intention with which their verdicts were rendered. It does not appear that the rules which ought to have guided them in awarding damages were laid before them, and the error into which they have fallen was in the interest of the public peace, and against the right of any man to take the law into his own hands. We must not be understood as recognizing the right of trustees to execute and carry out the trusts created upon slaves which are in this State, without the intervention of judicial proceedings, as it is not necessary to examine that question in order to decide this case. We have examined the decisions referred to by counsel concerning the weight to be given to verdicts of juries, and have not come to the conclusion that the verdict in this case cannot stand, without the most mature consideration.

It is, therefore, ordered that the judgment of the District Court be annulled and reversed, and that the plaintiff recover from defendant the sum of $100, with interest from this date, and costs of suit in the District Court, and that he pay the costs of this appeal.